May it please the Court. I am Randall Callinan and I represent the appellant, Dr. William Windham. I'm requesting five minutes of my time to be reserved for rebuttal. The District Court's final judgment against appellant should be reversed and remanded for further consideration by the District Court. The District Court erred when it granted summary judgment on appellant's Americas with Disabilities claim on the grounds that appellant offered no evidence of intentional discrimination. The District Court also erred when it granted summary judgment on the excessive force claims on the ground that appellant's injury was an exacerbation of a preexisting injury. Furthermore, the District Court erred when it granted summary judgment on the Fourth Amendment unreasonable search-and-seizure claim on the grounds that the officers had a reasonable suspicion to detain appellant and that the length of detention was appropriate and did not create a constitutional violation. Regarding the ADA claim, appellant can demonstrate sufficient facts to overcome summary judgment that Harris County is liable to him due to its failure to accommodate him under the ADA. Appellant presented sufficient facts to establish a prima facie case. His case is extremely similar to Delano Pyle v. Victoria County, Texas, from this very court, almost identical, in fact, except for the type of disability. In Delano Pyle, the incident began with a car accident on the highway and reports of a potentially impaired driver mirroring exactly what happened with Dr. Windham. Just as with Dr. Windham, the deputies had knowledge of the plaintiff's disability prior to ordering him to perform the standard field sobriety test. And despite knowledge of this disability, the deputies refused to make a reasonable accommodation. Robertson, when you say they refused, where in the record and a record site would help or even a video date stamp time, where did he request the accommodation that they refused? Yes, Your Honor. In the video, what was his affirmative request for an accommodation? Appellant aversed that when the officer went up with his panties, he was taller, the second officer was taller than the first officer, who was actually shorter than the doctor, the second was taller. He said, my neck hurts. And I think that when someone says, my neck hurts, after they've given you a letter from another doctor which says you can't extend the neck due to injury, that when you say, this hurts, and earlier you said, I can't do it, I believe that is an affirmative. Did he say, I can't do it? Well, the letter says cervical stenosis, and then it indicates that's a contraindication for thyroid surgery, and it's the doctor's letter. That would be hard for an officer to understand, maybe one leg stand, walk and turn, but not neutral gaze. So then it would, to me, it would seem to me, unless it's obvious the accommodation is requested, he would have to then, as a doctor himself, say, here's what I can do. I can do those sobriety tests, but not this one. But he doesn't do that. He says, when the officer says, are you refusing, he says, no, but he does say, you're right, it hurts. Well, let me address that. And the letter that he showed Deputy Dunn and Deputy Paskett, he's shown on the video actually reading it. And I questioned him in the deposition. And if you look in the letter, and it's very short, which is good, because of the patient's risk of neurological injury from neck extension, and then the extension is in the dictionary. This is extension, according to, straight, to put yourself straight. And he testified at deposition, Deputy Dunn did, that he knew what extension meant. And also, he said he understood, and he read, the part about neurologic injury. So according to Dunn himself, out of his own mouth, he knew what extension was, and he knew what neurological injury was. He had read this letter from a doctor, and another doctor said earlier in the video, I won't be able to do it. Then he says, are you refusing? And then the doctor says, no, he's not refusing. But, so, and when he lifts up his, when he makes him lift up his head, he's saying, it hurts. So the fact that he was shown a letter, admits that he knows what neurological injury is, admits he knows what extension is, and then the doctor is there, the doctor also explains what is wrong with his neck, as well. And if you look through the entire video, he is looking down somewhat like this. Alano Pyle is a deaf, the disability is deafness, right? That is correct. But it makes sense then, if you get pulled over and you're deaf, it would be very obvious to officers that they need to do something other than speak to you. But your proposition is here, it has the same level of obviousness, that he couldn't do a certain sobriety test based on the letter? Yes. I think that's a cool idea. What's the best case that's not in a deafness? Because to me, deafness is a much more obvious need for an accommodation. Do you have any case that is closer to a neurological deficit being one that an officer would understand would mean, even without, A, here's the accommodation I need, just an officer would know? What's the best case outside deafness? Okay. There is a case out of another circuit, however, it is with an injury to the neck. And that is, I think it's out of the Third Circuit. If it's in your brief, that's fine. Yes, it is in your brief. It is? Yes, it is, Your Honor. Sorry about that. But there was another case where, and that was the case that actually goes to more to the excessive, not more, but also to the excessive force, where we state that ordering someone to do it is, can be considered force. And depending upon the situation, it can even be considered excessive force with no touching. In that particular case, an individual had a neck injury and she wasn't touched, but ordered to do things after they knew about the neck injury and it caused more damage. But you wouldn't win on your excessive force claim if you don't win on your ADA claim, because if it's reasonable for the officer not to have perceived an accommodation was necessary, you couldn't win on a Fourth Amendment unreasonableness ground, right? The ADA does not take into consideration qualified immunity. There is no qualified immunity for the ADA, only under excessive force for the 1983 action. So under that standard, for the ADA, the ADA cases basically use a deliberate indifference standard. Most of the circuits do. In Delano Pyle, it was the Fifth Circuit case. However, it wasn't exactly clear. There really didn't seem to be like a defining set of words to define exactly what you could use to show intentional discrimination. However, the Supreme Court has stated in dicta in a case regarding the ADA that because a lot of the ADA cases and disabilities are not because of animus, but just because of indifference, that that is probably the better standard. And deliberate indifference already includes that it's deliberate. And it's not just indifference, but there's a second word there and that's deliberate. So if it was just merely indifference, that'd be one thing. But deliberate requires that you actually know what's going to happen to this person if you don't act. It requires that you actually... My questions, I agree, the scienter law is a little bit blurred and difficult. My questions were more, the law seems to put the burden on the disabled person to articulate the accommodation needed, unless it's so obvious that a reasonable officer would have to know. That's what I understood the law to say, which is why I'm asking you for a best case that shows this type of cervical stenosis would be so obvious that you don't we aren't asking police to guess at what the accommodation, that's my concern. Well, I got a point to a letter from a very short letter from a doctor that says you can't extend a neck due to neurological injury. To me, well, to most, to most police, they should understand what that means. And in the deposition, Dunn said he did know what it meant. He said he knew what extension meant. And he said he knew what neurologic injury meant. So this isn't a case where Dunn did not know, didn't have the requisite knowledge to know what was going on. So if you look at that, the jury can easily determine that he did have the requisite intent and that he knew that it was dangerous to go forward, because under the with action or inaction, and you cause the constitutional violation. But the officer before Dunn had asked your client to do the horizontal gaze test, too, right? Yes. And he was shorter. And he could do it because he kept his eyes down like this. Because remember, if you look at the video, he's constantly all the time like this when he's talking to people, with his head down and his eyes like this. That should clue you in that there's something going on. Because no time at all does he go like this or raise his head. So if you were an officer and you come across somebody that says, here's a letter, I got a neurological injury, I can't extend my neck, I think right there at that point, to move forward and then say, oh, look up, look up. No, my neck hurts. He said his neck hurts several times. And other times he says, I can't do it. So the horizontal gaze test was appropriate. The problem is the officer height discrepancy, right? That's what you're saying? The first officer, same height, holding this, horizontal, neutral, no extension? Right. Now, the training that they received at Harris County, according to the 30b6 deponent, which we brought forward to talk about these training issues on the standard field sobriety test, said that the officers are trained that the officer must be able to look into the person's eye when they're standing and do the test. So when he did the test, the training was that the officer has to be accommodated furthermore, when the 30b6 deponent, about all the training and so forth, testified that they don't have any training at all to deal with neurological injuries or neck extensions or anything. And furthermore, Dunn testified that deposition, after he'd been sued and after he'd seen all the allegations about the height and everything, Dunn said, I said, would you do the same thing? I questioned, would you do the same thing now that you know this? And he said, yes, I would still do the same thing. This was after he knew exactly what happened to Mr. Windham, had read all the, read the complaint. I asked him, did you read the complaint? And he had read the complaint. So he today, apparently, will still do this again. So we need Harris County to change their way to accommodate this. And it's very simple. All he had to do was do the same thing as Paskett did, Deputy Paskett. But they're not trained appropriately. So there was an easy accommodation. This wouldn't cost even no money. There's no argument that that's an expensive accommodation. It's a couple words in a training session. Very simple accommodation. So furthermore, regarding the... I'm just curious. Sure. How can you see to drive if you're like... Well, yeah, he does have to keep his eyes up. But he was a doctor. And sometimes he felt it necessary that he, on occasion, did need to drive. And on that day, he felt like he needed to drive. He couldn't get around it. And so basically, he didn't risk it, risk driving. However, you know, if you've got your neck down like this and you look like with your eye up, you can still, I can look at you all and... But he did hit the person in front of him. It was a tap. The guy even left without even getting the insurance because there was no damage. So he had... I mean, he touched him. That is correct. And basically, the way he testified was that he inched forward and, you know, just probably enough to feel it because the fellow didn't even file a... did not sue Dr. Wyndham or even file a claim. No one ever called him about any claims. So, you know, another thing that I believe is important that the officers testified that never testified that holding your head down is a sign of intoxication. They testified falsely, by the way, that Dr. Wyndham had blurry eyes. He had slurred speech. But when you look at the video, he's not slurring his speech. He doesn't have blurry eyes. Maybe you'd have to get closer to see whether they're blurry eyes. However, they also say his hands are shaking. You see his hands are shaking. So basically, you see on the video things that contradict what the officer says that cause any reasonable suspicion in the first place. And as I mentioned, having your head down is not a recognized sign of intoxication. The whole context of facts where you did have contact, the other person said, I think he's drunk, correct? A driver, just like... But we're just looking at the larger orbit for reasonable suspicion. And then I thought somewhere in there it reflected he had nodded off a little asleep maybe in the car. No? I did not, Your Honor. Okay. I didn't. Not in your memory. Okay. Not in our fact scenario. But so whether there was reasonable suspicion, it's possible there was reasonable suspicion in the beginning. But remember, he sat there for an hour and a half. And the standard field sobriety tests just take minutes. And so for some reason, he was there for an hour and a half. Why is he there for an hour and a half? He did not agree to be there for an hour and a half. They took his driver's license as reported in the brief. And so he was not free to go. And as a matter of fact, because he was in a loner car, he didn't even have his own car to drive away. So there is a concept of how much danger the public would be in or anybody else. Well, apparently, they were investigating class B misdemeanor. And sure, driving while intoxicated, you know, if you were to keep on driving, that would be a problem. But the dealership came and took the car that he was with because he was in a loner vehicle because his vehicle was somewhere else. So the danger that he presented was extremely low. He didn't even have the ability to drive a car any longer during that period because the car had been taken. So and he didn't he did not swear at anyone. He did not swing at anyone. He did not argue. Argue with the. Your initial time has expired. Thank you, Mr. You save time for Mr. You may please the court. First thing I want to talk about is the ADA claim. In this instance, there is no evidence of intentional discrimination, and that is required to support a claim for compensatory damages under the ADA. Normally, that requires evidence of malice, ill will or other indication of discriminatory amicus. That language comes from the Campbell versus Louisiana Institute of Technology case. Nothing that Dr. Windham said to Deputy Dunn would have alerted a reasonable officer that Dr. from performing field sobriety tests. In that regard, Dr. Windham made no request for any accommodation from Deputy Dunn, and he expressed no reluctance or concern about performing the tests. He was in a much better position than Deputy Dunn. Dr. Windham was in a much better position than Deputy Dunn to evaluate whether there was a risk and to tell Deputy Dunn if he really shouldn't be doing it. Yet, when Deputy Dunn asked him if he was refusing to take the test, he said, no, I'll do it. He expressed doubt about being able to do it, though, at one point, did he not? He did. He expressed some doubt as to whether he could successfully do them. And when you saw him perform the tests, you could see why he maybe thought that, because he sort of stumbled. And I think it was probably, you know, well, I don't know what was causing that, but he did stumble. Maybe that's why he thought he would not be able to do it. A plaintiff must show that the defendant's employee knew not only of the plaintiff's disability, but also the physical limitations resulting therefrom. Now, in addition to the Fifth Circuit case that we cited in our brief on that point, in support of that position, there is a Tenth Circuit case that is not in the brief which also supports the argument, and I wanted to bring that to your attention. That case is Robertson v. Los Alamos County Sheriff's Department at 500 Fed Third 1185. I didn't put it in the brief because I just didn't run across it until I was doing the preparation for this argument. In Robertson, the court said that before a public entity can be required under the ADA to provide an auxiliary aid, the entity must have knowledge that the individual is disabled, either because the disability is obvious. Can you talk up just a little? Sorry, Your Honor. Or because the individual has informed the entity of the disability. However, in addition, once a public entity has knowledge of the disability, the entity must also have knowledge that the individual requires an accommodation of some kind. That means that the public entity must have knowledge that the disability limits the individual's ability to participate in or receive the benefits of its services. If the need for an accommodation is not obvious, the public entity will usually not have knowledge of the need for an accommodation unless the individual requests an accommodation. In the instant case, Dr. Windham was in a far better position than Deputy Dunn to evaluate the need for any accommodation. The videotape shows that Dr. Windham did not ask Deputy Dunn for any accommodation. The information Dr. Windham gave Deputy Dunn about his condition was simply not sufficient to inform Deputy Dunn that Dr. Windham could not safely raise his head to a normal level. Therefore, the ADA claim was not supported by the evidence. But it comes, a lot of it comes down to obviousness, because you recognize that disability could be so obvious, the officer would have to accommodate even without a request. Yes, Your Honor. Your point is here, there's no material dispute of fact as to obviousness because the letter's too sort of sophisticated and esoteric? Well, it really doesn't convey to a person who's not trained in medicine that there's some risk associated with a fetal sobriety test. I mean, the focus of the letter was talking about neck extension in connection with a surgery. And I don't think that's going to alert a police officer that there's something that the man can't raise his head even as high as just to look straight ahead. And I think that's reasonable. Now, next I want to address the excessive force claim. Well, just to pause on that, they claim the word extension alone implies if the head is frozen down, lifting it up to straight was something that the officer was told he couldn't do. And then he says it hurts. Well, when he says it hurts, it seems to me that because he is a physician and a peace officer, he's required to alert the officer who's not a trained physician that there is a risk of serious injury if he continues. I mean, the mere fact he says it hurts doesn't necessarily indicate that an accommodation is really necessary. In other words, in an arrest context, and there was no arrest here, but it was a detention context, in that context there often is some discomfort associated with it. But that's not in and of itself enough to be a violation of the ADA. With respect to the excessive force claim, to establish an excessive force claim, a plaintiff must prove that he received an injury that resulted directly and only from the use of force. In this case, the videotape shows that the officers did not employ any force against Dr. Windham. Even if an HGN test could somehow be viewed as a use of force, it was reasonable force employed as part of a routine police procedure. Therefore, any resulting injury could not support an excessive force claim. If some injury occurs in connection with the use of reasonable force, that injury does not support a constitutional claim. It must be the use of excessive force in order to support that kind of a claim. However, even if there had been a constitutional violation, Dr. Windham failed to overcome the officer's entitlement to qualified immunity. To do so, Dr. Windham had to demonstrate that Deputy Pasquette and Deputy Dunn acted objectively unreasonably in light of clearly established law. Since there was no existing Supreme Court or Fifth Circuit precedent holding that administering an HGN test can constitute a use of excessive force, there was no clearly established law at the time of the incident. Therefore, Pasquette and Dunn are entitled to qualified immunity. Now, with respect to the unlawful detention claim, Dr. Windham contends that his detention constitutes an arrest for which there was no reasonable suspicion or probable cause. However, he clearly committed the offense of failure to control his speed in violation of Section 545.351b2 of the Transportation Code. He bumped the Robuchaw vehicle. Deputy Pasquette observed the damage to the vehicles, and that observation provided reasonable suspicion to detain Dr. Windham, particularly when the witnesses present said that Dr. Windham nodded off while waiting for the officer to arrive. Now, with respect to this issue of whether or not Dr. Windham had watery eyes or his That's something that Deputy Pasquette observed when he first arrived. By the time Deputy Dunn arrived, a good deal of time had gone by, and it's entirely possible, I suppose, that if he was showing signs of impairment, they may have decreased to some degree or other in that period while waiting for Deputy Dunn to arrive. You know, Deputy Pasquette didn't have any incentive to falsify his report about that. He didn't. They didn't arrest Dr. Windham. He's not. He's not trying to support an arrest. He just put down. That's a sort of separate problem here. They don't arrest him. So the issue is, one issue is, Pasquette does the sobriety tests. He doesn't fail them. Then he prolongs the detention a long time till Dunn comes. Is your position as a matter of law that an officer can prolong a reasonable secession detention for just a second opinion for as long as they want? Well, if he sees an indication, and he did in this instance, if he sees an indication that there is some question as to whether or not the man's intoxicated, he can't just turn him loose on the road again. He has to alleviate the concern. What's the best case that describes just how long? Because these are busy cities. So how long? Well, just maybe tell me this. How long did it take for Dunn to arrive? How long was that interval? My impression was that it was close to an hour. But I really don't remember that detail. But it was a good while. And the case law says that you can maintain the detention sufficiently to alleviate the suspicions. And that's what they were doing here. Deputy Pasquette felt like he needed to have a certified drug recognition expert look at this man. And that's why he called for him. Unfortunately, Deputy Dunn was clear across town, apparently. It took quite a while for him to arrive. Yeah. As this court said in U.S. v. Brigham, there is no constitutional stopwatch on traffic stops. The question is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions. That was done in this case. Deputy Pasquette felt he needed assistance from Deputy Dunn. And he had no control over how long it took Deputy Dunn to arrive. Once Deputy Dunn did arrive, the field sobriety tests were completed in an expeditious manner, and Dr. Windham was released. Now, with respect to the training claim, to establish liability on a failure to train theory Dr. Windham had to show inadequate training procedures, also that the inadequate training caused the constitutional violation, and deliberate indifference of policymakers. A training program must enable officers to respond properly to the usual and recurring situations with which they must deal. Dr. Windham had to show that Harris County's training program, the training program, not the training of these specific officers, was inadequate to meet that standard. The possibility of an injury occurring in a rare or unlikely encounter does not suggest that a training program is constitutionally deficient. We submit that this encountering a driver with a neck condition like Dr. Windham's is not a usual and recurring situation. Thus, there was no evidence to support the training claim. I thought it was interesting that Dr. Windham's counsel said that Dr. Windham needed to drive, so he decided to risk it. Maybe that's what he was doing with respect to the field sobriety test. Maybe he decided to risk it and not tell the officers that he simply shouldn't be doing that, or requesting that they give him some alternative method of demonstrating his sobriety. If he didn't alert them as he should have, they could not know what they needed to do, and therefore Harris County could not know that it had to provide any accommodation. The other thing that was interesting is the statement that there may have been reasonable suspicion at the beginning, but that it somehow dissipated. If there was reasonable suspicion, they had to dispel that suspicion, and the process they went through was designed to do that.  Keep in mind, with regard to the detention factor, if they had probable cause or reasonable suspicion with respect to that transportation code violation of rear-ending that vehicle, that's an offense that you could arrest for. They didn't do it. They normally don't do that sort of thing, but you can arrest a person for doing exactly what Dr. Windham did. If you can do that, then you can hold him long enough to go through your investigation. Now, what it comes down to basically on this case is that Dr. Windham, being a doctor, being a law enforcement officer, knew his rights. He knew what risk, if any, he was taking,  and he had to tell them more than he told them in order to establish an ADA violation. If the court has no further questions. All right. Thank you, Mr. Gowers. Mr. Kellen. Thank you. Save time for a moment. I would like to point out that in the letter that was shown to Deputy Dunn, who admits he read it, admits he knows what the extension is, it also says, by a doctor, at the last sentence, it says, kindly afford him the opportunity to address these issues in whatever way that you can help him. To put the burden, the tremendous burden upon the plaintiff to explain his injury, let's look at what he did. He, first of all, presents like with his head down all the time. If somebody is with their head down all the time, like this, walking around, and I apologize for walking, but I got to do this demonstration. Going like this, who doesn't know, who's seeing the guy for a long time, that there's something wrong with his neck? I mean, it's like this entirely on the video. Why is a doctor, we're not talking about some, maybe some long-time criminal who knows that to stay out of jail, he can fake some injury and then go to the hospital instead. We're talking about a person who has never been arrested for a crime in his entire life. And he's going, he's got his neck down like this, so that should have been the first indication about the problem. And furthermore, remember that Paskett had been there for almost an hour before he showed up. We can assume that Paskett actually talked to him about the condition of Mr. Um, Dr. Windham prior to it. So he could explain all this because Paskett said he also read the letter. So you got a guy who's a doctor, not a criminal of any kind, and he's got his head down, there's one indication. Then he presents a letter with his head down to you, which says, he's at risk for strenuous activities because of the patient's risk of neurological injury from neck extension. When he admits he knows what neck extension is, he knew it at the time. That's what he testified to. Um, despite all that, if that wasn't enough, then he says twice before they even start, I can't do it. So he's got this obvious, very extremely obvious, if you see a guy that's walking around with his head down like this, that's obvious to me. It's obvious probably to any lay person. They might say, hey, what's wrong with your head there? I think it's extremely obvious. And certainly a juror could determine that it was obvious, especially coupled with then the letter. Um, and then he said, I can't do it. Before this, uh, they started, I can't do it. I can't, you know, I can't do it. He said that like twice. And then, uh, when he did, started doing it, he said, my neck hurts. I don't know if it was once or twice, but at least once. So how many indications do you need? It was quite obvious. Now to place the burden upon the individual, what kind of burden are we talking about here? Mr, uh, Dr. Windham, uh, did everything he could. Um, intent is not a, uh, intent is not a part of a prima facie case of ADA. Um, uh, there was some, uh, remark about turn him loose on the road. Once again, the car was taken from him. Furthermore, that's not the only option. Turn him loose on the road. Remember, uh, he is a licensed peace officer, but he's a reserve officer. He doesn't go out on the road much. So he doesn't have much experience. A lot of people are reserve officers.  You don't, you don't really, you don't have much experience. Uh, works of the concept that he's a peace officer that has limited ability. Um, but, uh, I'm sure if they would have asked him, hey, you know, we're going to let you go, but can we drive you home? He would have said yes. So there was no turning him loose on the road, no car. Um, and there was no danger to the public, uh, whatsoever. Um, uh, Dr. Windham was a pilot. He cannot be a pilot anymore. He was an anesthesiologist, a very good one, uh, with a very good practice. He was severely injured, uh, and that prevented him from doing his, his doctoring job. And of course he could not do his police work because of his injuries. He was extremely severely injured and, uh, he is entitled to relief under the ADA for excessive force and for an, for an unreasonable, uh, detention and arrest. If you have no further questions, Your Honors. All right. Thank you, Mr. Callion. Your case is under submission.